HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EMMA MANNING,

          Plaintiff,

      v.

TACOMA PUBLIC SCHOOLS, ET AL.,

          Defendants.

Case No. C06-5078  RBL

ORDER

Pending before the Court is Defendant's Motion for Summary Judgment, Dkt. No. 36. The court has considered the pleadings filed in support of and in opposition to the motions, the file herein, and the oral arguments of counsel.

## I. BACKGROUND

Plaintiff in this employment discrimination case is an African American woman who claims to have dyslexia and attention deficit hyperactivity disorder (ADHD). She was employed as an office assistant by the Tacoma Public School District from October 1998 until she was terminated by the School Board of Directors on July 28, 2005. The circumstances of her last few years of employment and her eventual termination gave rise to this action, in which she asserts that she was discriminated against and wrongfully terminated on the basis of her race, gender, and disability. Her complaint also asserts that she was subjected to a racially or sexually motivated hostile work environment, that she was retaliated against for filing complaints with the U.S. Equal Employment Opportunity Commission (EEOC), and that she suffered emotional distress that was intentionally inflicted upon her by District management, supervisors, and co-

workers.

In October 1998, Margaret Ohlson, a supervisor with the Buildings and Grounds department, interviewed Ms. Manning and hired her into a temporary position as "Secretary, Maintenance." Ms. Ohlson, a Caucasian woman, hired Ms. Manning despite the fact that pre-employment testing showed that Ms. Manning's technical skills were unsatisfactory. Ms. Ohlson, however, believed that Ms. Manning's skills would improve. Approximately six months later Ms. Manning became one of the two permanent Maintenance support staffers in the department. Her position was classified as Office Professional 5 (OP5). The other permanent staffer, Susan Larson, a Caucasian woman, had been there for many years and was classified OP6.

Ms. Ohlson gave Ms. Manning a favorable and complementary performance review in 1999, but by 2000, Ms. Manning had started to complain about her job. On August 3 of that year, Ms. Manning sent out to all team leaders a memo indicating that she believed her future career prospects were being harmed by "negative and belittling remarks." It is not clear from the record exactly what these belittling remarks entailed or by whom they were made, but it is clear that by August 2000, Ms. Manning felt that she was being treated unfairly. Earlier that year, the Buildings and Grounds department started an organizational review, and Ms. Manning's position was not recommended for a reclassification. Ms. Manning apparently did not receive a performance review in 2000.

By her 2001 performance review, Ms. Manning was rated largely satisfactorily, but Ms. Ohlson and Ms. Manning both recognized that Ms. Manning needed to improve her attention to details. Accordingly, during that year, Ms. Ohlson attempted to help Ms. Manning improve the quality of Ms. Manning's work product. In doing so, Ms. Ohlson stated that she acted towards Ms. Manning just as she would towards any other employee she supervised.

Early in 2002, Ms. Manning wanted to have her position reclassified, but she was apparently told that there would be no reclassification of either of the Maintenance support staff positions. A couple of months later, however, the other Maintenance support staffer, Susan Larson, requested a reclassification and was subsequently reclassified from OP6 to Professional Technical 7, a move that apparently earned Ms. Larson a higher rate of pay. Ms. Manning believed that this reclassification was unfair and complained about it to her Union Representative and apparently to other District officials. Eventually, on July 25,

2003, she filed a charge with the EEOC alleging discrimination and retaliation surrounding the reclassification.

In the months leading up to Ms. Manning's 2003 EEOC charge, she received another performance evaluation. In the comments section of that evaluation, Ms. Manning's supervisors mildly criticized her accuracy, thoroughness, detail, and interpersonal skills, criticisms that Ms. Manning did not dispute. Ms. Ohlson also explained to Ms. Manning that Ms. Ohlson had wished to lower Ms. Manning's evaluations, but that the collective bargaining agreement forbade lowering an evaluation without giving the employee 60 or 90 days prior notice. For unknown reasons, Ms. Ohlson did not give Ms. Manning such notice, so the largely satisfactory ratings from Ms. Manning's 2001 evaluation were allowed to stand.

The year 2004 was eventful—Ms. Manning received a letter of reprimand, was twice suspended without pay, sued the District, and, after receiving notice that her performance evaluation would be lowered, was rated unsatisfactory in four of ten categories in her performance review.

The letter of reprimand resulted from two incidents on February 4, 2004, in which Ms. Manning was apparently terse and/or rude to other District employees, including an incident in which she apparently argued with Susan Larson. Later that day, Ms. Manning walked out of a meeting concerning that incident. Present at the meeting were Ms. Manning, her supervisor, the department director, and Ms. Larson. Ms. Manning apparently left the meeting and refused to return despite repeated requests by the director. In response to this behavior, the District issued a letter of reprimand. On February 8, 2004, Ms. Manning filed her second complaint with the EEOC, alleging that she was singled out for discipline and that the District was retaliating against her for filing her 2003 EEOC charge.

The details leading up to the first suspension without pay are somewhat murky, but the foundation was apparently laid in 2002, when a student intern had spoken with someone at the District's Central Administration Building regarding a comment Ms. Manning had made to the intern. *See* Dkt. #39, p. 2; Dkt. 42-2, p. 12. The intern apparently had asked that her complaint be kept anonymous, which may be why Ms. Manning did not discover until 2004 that the intern had complained about her. When Ms. Manning made this discovery, the same student intern was still working for the District. Ms. Manning apparently made a comment to a supervisor that she did not want to work alone with that intern, possibly fearing that the intern would make further complaints that Ms. Manning would not have the opportunity to

respond to. When she heard that Ms. Manning was refusing to work with her, the intern apparently filed another complaint, alleging that Ms. Manning was retaliating against the intern based on the intern's 2002 complaint. As a result, Ms. Manning was suspended for five days without pay.

The second suspension without pay came after Ms. Manning took unauthorized vacation time in April 2004. Ms. Manning had originally requested six days of vacation from Wednesday, April 14 through Wednesday April 21. Dkt. #42-3, p. 3. However, she had apparently only accrued enough vacation time to cover two of those days, and her original request for leave was denied. In late March, she revised her request, asking for only two days off: Friday and Monday, April 16 and 19. These two days were approved. But Ms. Manning then was absent from work from Thursday April 15 through Wednesday April 21, a period of time that corresponded closely to Ms. Manning's original request. Ms. Manning asserts that a combination of her confusion over dates, delays, missed flights, and illness caused her extended absence. The District, however, believed that her second request for only two days off was a false record and suspended her for ten days without pay.

According to the District, from May 2003 through April 2004, Ms. Manning had been absent from work for over eleven days of vacation, over twelve sick days, over two days of family leave, three days of "extraordinary leave," and over ten days of leave without pay. *See* Dkt. #42-3, pp. 3, 5. In other words, the District's records showed that in a twelve month period, Ms. Manning had taken a total of over 38 days of various types of leave, missing almost eight full weeks of work. Still, in her performance evaluation for that same period of time, she was rated unsatisfactory in only four of ten categories. Dkt. #42-2, p. 14. (The District had given her proper prior notice that her performance evaluation would be lowered.)

In August 2004, Ms. Manning filed a lawsuit against the District, Case No. C04-5491-FDB, alleging that it had failed to promote her in violation of "Civil Rights Acts," the Americans with Disabilities Act, and the Age Discrimination in Employment Act. Dkt. #37-3, pp. 24-27. That suit was dismissed five months later for insufficient service of process. Dkt. #37-3, p. 30-31.

On February 4, 2005, Ms. Manning was given notice that her performance evaluation would again be lowered. Dkt. #37-3, p. 34-40. That memo contained a detailed written account of numerous performance problems, as well as detailed suggestions for improvements. Following the memo's recommendation, the District Superintendent placed Ms. Manning on probation from February 8 through

April 29, 2005. Dkt. #37-3, p. 42-43. During this eleven week probationary period, Ms. Manning was expected to satisfactorily perform the duties of her assigned position and improve her performance as outlined in the February 4 memo. If she failed to satisfactorily perform her assigned duties, Ms. Manning's employment could be terminated.

After two months of her probationary period had elapsed, Ms. Manning was given a performance evaluation. Dkt. #37-4, p. 8-10. According to that evaluation, she had not improved her performance, and her performance was found to be unsatisfactory in nine of ten categories. The District Superintendent sent Ms. Manning a letter notifying her that he would recommend to the School Board that her employment be terminated effective April 22, 2005.

Shortly *after* receiving this notification, Ms. Manning sent a letter to the School Board requesting accommodation for two disabilities: Attention Deficit Hyperactivity Disorder (ADHD) and dyslexia. She also requested that her termination be deferred for a week so that her conditions could be evaluated at an appointment she had made with a psychiatrist, Dr. Hwang. *See* Dkt. #42-2, p. 17. In response, the School Board noted that it had been unaware of any claimed disability, but agreed to consider her requests nonetheless, deferring its consideration of her termination and placing her on unpaid administrative leave, effective April 22. Dkt. #37-4, pp. 12-13. Although there was some initial confusion, it was eventually settled that Ms. Manning was to remain on unpaid administrative leave until July 28, 2005.

On May 13, the District notified Ms. Manning that it sought a second opinion regarding her medical condition to determine what, if any, reasonable accommodations she would need to perform her assigned duties. Dkt. #37-4, p. 20. Accordingly, the District made an appointment for Ms. Manning with Dr. Clark for Monday May 23 and directed her to attend that appointment. On Thursday May 19, at approximately 4:50p.m., Ms. Manning faxed a letter to the District, asking the District to reschedule her May 23 appointment with Dr. Clark. Dkt. #42-3, p. 15. In that letter, she stated that she had an appointment with Dr. Hwang on May 27 and that she and Dr. Hwang would discuss accommodations. The District replied the next day, reiterating the importance of the May 23 appointment with Dr. Clark, reiterating that the District would be paying Dr. Clark's fee and would be paying Ms. Manning her regular wage for the appointment, and clearly stating that failure to attend the May 23 appointment with Dr. Clark would be deemed insubordination and could subject Ms. Manning to disciplinary action, including

termination.

In a postscript to that communication, the District noted that Ms. Manning had called to say that her appointment with Dr. Hwang was on May 23, not May 27 as she had originally indicated. Although Dr. Hwang would later send a letter saying that Ms. Manning's appointment had been scheduled for May 23 all along, the District believed at the time that Ms. Manning was being uncooperative and attempting to delay the District's investigation of her medical conditions. The postscript again stated that failure to attend the appointment with Dr. Clark would be insubordination.

Ms. Manning did not attend her appointment with Dr. Clark.

On May 23, Dr. Hwang sent the District a letter purporting to include the psychiatric evaluation of Ms. Manning that he had conducted on April 27. Dkt. 42-3, p. 17. However, Dr. Hwang's letter did not actually include that evaluation. Dkt. 42-3, p. 27. On June 1, the District sent Dr. Hwang a letter informing him of this omission and asking him to forward a copy of the evaluation.

On July 18, ten days before the end of Ms. Manning's unpaid administrative leave period, the District notified Ms. Manning of a meeting at which Ms. Manning would be able to present information that she believed the District should consider before a decision was made regarding her employment. Dkt. #37-4, p. 22; Dkt. #42-3, p. 38. The record is unclear as to exactly when this meeting was held, but apparently it did take place sometime before July 25.

On July 22, Ms. Manning filed her third complaint with the EEOC, complaining that the District had placed her on unpaid administrative leave and complaining that the District had recommended her for termination. She alleged that the District's stated reasons,  poor job performance and insubordination, were pretexts and that in reality, the District had discriminated against her on the basis of her race, disability, and age. Additionally, she alleged that the District was retaliating against her for making two previous EEOC complaints. Dkt. #37-4, p. 24.

On July 26, the District informed Ms. Manning that she was to be terminated, effective July 28. Dkt. #42-3, p. 39-41. The notification of termination recounted the grounds that originally caused the District to recommend Ms. Manning's termination and added a new charge of insubordination arising from her failure to attend the appointment with Dr. Clark.

The following day, July 27, Dr. Hwang sent a letter that again purported to include his psychiatric evaluation of Ms. Manning. The record does not indicate whether he did include that evaluation or what his findings were.

Ms. Manning was terminated, effective July 28, 2005.

On November, 7, 2005, the EEOC issued a right to sue letter. On February 8, 2006, Ms. Manning filed this suit in federal court, asserting discrimination and retaliation on the basis of race, gender, and disability. Her complaint also asserts that she was subjected to a racially or sexually motivated hostile work environment, that she was retaliated against for filing complaints with the EEOC, and that she suffered emotional distress that was intentionally inflicted upon her by the District, District management, and several named supervisors and co-workers. Her causes of action arose in tort and under the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act of 1964.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a

preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 242).  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990). On the contrary, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 322 (quoting Fed.R.Civ.P. 56(e)). Moreover, when "the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001); *see also Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (holding that the requisite "showing" can be made by "pointing out through argument--the absence of evidence to support plaintiff's claim").

## II. DISCUSSION—UNOPPOSED ISSUES

### A. Ms. Manning's briefing on 42 U.S.C. § 1983

Ms. Manning's brief in opposition includes a section on claims arising under 42 U.S.C. § 1983, even though she asserts no claims arising under § 1983. Ms. Manning's complaint specifically states that she is asserting claims under Title VII of the Civil Rights Act of 1964 and under the ADA. Nowhere does she reference § 1983, nor does she state or imply that she was deprived of a federally protected constitutional right under color of state law. Ms. Manning also never sought leave to amend her complaint and has conducted no discovery regarding a § 1983 claim. Thus, defendants had absolutely no notice that Ms. Manning intended to assert a § 1983 claim until they received her opposition brief after the close of discovery, a scant two months before the scheduled trial date. To avoid unfair prejudice to the defendants, Ms. Manning cannot add a new cause of action at this late stage, and she certainly cannot sneak in a new cause of action in an opposition brief. The court has therefore disregarded her briefing regarding 42. U.S.C. § 1983.

1

2             *B. Claims against individual defendants Mr. Watson and Mr. Price*

3         Individual defendants Mr. Watson and Mr. Price argue that because they have not been served, the

4 court lacks personal jurisdiction over them. Ms. Manning does not respond to this argument. "When a

5 defendant moves to dismiss for lack of personal jurisdiction, the plaintiff is obligated to come forward with

6 facts, by affidavit or otherwise, supporting personal jurisdiction." *Scott v. Breeland,* 792 F.2d 925, 927

7 (9th Cir. 1986) (internal quotations omitted). Ms. Manning has not come forward with any such evidence.

8 Therefore, all claims against individual defendants Mr. Watson and Mr. Price must be DISMISSED for

9 lack of personal jurisdiction.

10

11       *C. Title VII and ADA discrimination and retaliation claims against individually named defendants*

12         The individually named defendants argue that they cannot be sued under Title VII or the ADA

13 because individuals are not considered to be "employers."

14        Title VII limits liability to employers with fifteen or more employees, 42 U.S.C. § 2000e(b)
       ..., in part because Congress did not want to burden small entities with the costs associated
15        with litigating discrimination claims. If Congress decided to protect small entities with
       limited resources from liability, it is inconceivable that Congress intended to allow civil
16        liability to run against individual employees.

17 *Miller v. Maxwell's Intern. Inc.,* 991 F.2d 583, 587 (9th Cir. 1993). "*Miller's* bar on suits against

18 individual defendants also applies to suits brought under Title I of the ADA." *Walsh v. Nevada Dept. of*

19 *Human Resources,* 471 F.3d 1033, 1038 (9th Cir. 2006).

20        Ms. Manning has not argued that there are any reasons why *Miller* and *Walsh* are not controlling;

21 indeed, Ms. Manning has not addressed this issue at all. In the absence of any opposition from Ms.

22 Manning, all Title VII and ADA claims against all individual defendants are DISMISSED with prejudice.

23

24                *D. Title VII gender discrimination claim*

25        Defendants argue that Ms. Manning's claim of wrongful termination on the basis of sex are barred

26 because Ms. Manning did not include this claim in her 2005 EEOC charge. An employee alleging

27 discrimination must file a charge with the EEOC within a specified time, generally 180 days, after the

28 discriminatory conduct allegedly took place. 42 U.S.C. 2000e-5(e). Such notice requirements are generally

1  treated as statutes of limitations. *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 674 -675 (9th Cir.

2  1988).

3      Ms. Manning was terminated on July 28, 2005, more than 180 days ago, so it appears that she is

4  statutorily barred from filing an EEOC charge of gender discrimination arising out of her employment with

5  the district. Again, she does not address this issue in her briefing, presenting no arguments why this claim is

6  not time barred. In the absence of any opposition from Ms. Manning, her Title VII gender discrimination

7  claim is DISMISSED with prejudice.

8

9                                    *E. State claims*

10     Before Ms. Manning can bring a tort action against a state or local governmental entity such as the

11  District, she must present a notice of claim to the District's designated agent and then wait sixty days. *See*

12  RCW 4.96.020(2-4). This non-claims statute has been held to be a valid condition precedent, and failure to

13  comply with its filing requirements leads to dismissal. *Pirtle v. Spokane Pub. Sch. Dist. No. 81,* 83 Wash.

14  App. 304, 308-309 (1996); *see also Troxell v. Rainier Pub. Sch. Dist. No. 307*, 154 Wash.2d 345, 360

15  (2005). Ms. Manning does not controvert the District's assertion that she did not file the required notice of

16  claim sixty days prior to filing this lawsuit. Therefore, her state law tort claims against the District must be

17  DISMISSED.

18

19            **III. DISCUSSION—DISCRIMINATION AND RETALIATION**

20                          *A. Burden shifting analysis*

21     The parties agree that the *McDonnell Douglas* three-part burden shifting analysis is used to analyze

22  the summary judgment motion with respect to Ms. Manning's remaining discrimination claims under Title

23  VII and the ADA. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dept. of*

24  *Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981).

25         First, the plaintiff has the burden of proving by  the preponderance of the evidence a prima
       facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case,
26     the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason
       for the employee's rejection. Third, should the [employer] carry this burden, the plaintiff
27     must then have an opportunity to prove by a preponderance of the evidence that the
       legitimate reasons offered by the [employer] were not its true reasons, but were a pretext
28     for discrimination.

*Burdine,* 450 U.S. at 252-53 (internal citations and quotations omitted). If the employer carries its burden in the second part of the analysis, "[t]he presumption... simply drops out of the picture." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 512 (1993).

To avoid summary judgment, Ms. Manning "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses. She must produce specific, substantial evidence of pretext." *See Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996). Such demonstration of pretext may be made "either directly, by persuading the court that a discriminatory reason more likely [than not] motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

### B. Title VII racially motivated hostile work environment claims

The claim of hostile work environment is aimed at redressing the wrongs that occur "[w]hen the workplace is permeated with *discriminatory* intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (emphasis added) (internal quotations and citations omitted). Therefore, to establish a *prima facie* case in a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that she was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Vasquez v. County of Los Angeles*, 349 F.3d 634,  642 (9th Cir. 2003).

Ms. Manning claims that she was belittled, subjected to negative comments, and disproportionately disciplined but provides specific factual allegations regarding only a few incidents. For example, Ms. Manning complains that Margaret Ohlson closed the door to her office when people came to speak with her. Ms. Manning suggests that the discriminatory nature of the alleged but unspecified intimidation, ridicule, and insult may be inferred from the following circumstances: that three African American women working under Margaret Ohlson's supervision all left their jobs with the District; that Ms. Manning, an African American woman, was the only office assistant to be terminated; and that when Ms. Manning got into altercations with two Caucasian women on the same day, the Caucasian women were not disciplined.

To determine whether conduct was sufficiently severe or pervasive to violate Title VII, the Court must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* In addition, the working environment must both subjectively and objectively be perceived as abusive. *Id.* The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct. *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 872 (9th Cir. 2001). Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.*

Because the elements to prove a hostile work environment claim are the same for both racial and sexual harassment, cases analyzing both types of hostile workplaces are relevant to the analysis of Ms. Manning's claim. The Ninth Circuit has examined these issues in detail numerous times, and the allegations in this case are not severe or pervasive when compared with other hostile work environment cases.

For example, in *Sanchez v. City of Santa Ana,* 936 F.2d 1027 (9th Cir.1990), the court dismissed plaintiff's hostile work environment claim, holding that no reasonable jury could have found a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino. *Id.* at 1031, 1036. The allegations in *Sanchez* were significantly more severe than those in this case, yet the *Sanchez* court held as a matter of law that there was no hostile work environment.

Sexual harassment cases also provide examples of the type of conduct necessary to produce an abusive work environment. In *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir.1998), the defendant created a hostile work environment where the plaintiff's supervisor made repeated sexual remarks about the plaintiff over a two-year period, calling her "gorgeous" and "beautiful" rather than her name, telling her about his sexual fantasies and his desire to have sex with her, commenting on her "ass," and asking over a loudspeaker if she needed help changing clothes. *Id.* at 1109. Likewise, in *Azteca,* a male employee of the restaurant was subjected to a relentless campaign of sexual insults, name-calling, vulgarities, and taunts of "faggot" and "fucking female whore" by male co-workers and supervisors at least

1   once a week and often several times a day. 256 F.3d at 870.

2       When considered in light of these previous cases, the District's conduct did not create an abusive

3   work environment. The allegedly harassing incidents, none of which contained racially related epithets or

4   overtones, did not create a hostile work environment for Ms. Manning. The conduct was less frequent, less

5   severe, and less humiliating than the conduct at issue in *Draper* or *Azteca*. Accordingly, the District's

6   conduct did not violate Title VII, and Ms. Manning's Title VII racially motivated hostile work environment

7   claims must be DISMISSED.

8

9                           *C. Title VII racial discrimination claim*

10      Title VII prohibits all discrimination in employment based upon race, sex, and national
    origin. "The broad, overriding interest, shared by employer, employee, and consumer, is
11  efficient and trustworthy workmanship assured through fair and ... neutral employment and
    personnel decisions." Title VII, however, does not demand that an employer give
12  preferential treatment to minorities or women. The statute was not intended to "diminish
    traditional management prerogatives."

13  *Burdine*, 450 U.S. at 259 (internal citations omitted).

14      Ms. Manning devotes the vast majority of her briefing to the third part of the *McDonnell Douglas*

15  burden shifting analysis, arguing that the District's stated reasons for terminating Ms. Manning were

16  pretextual. However, before the court can consider whether these reasons were mere pretexts, the court

17  must consider whether Ms. Manning has established all of the elements of a *prima facie* case.

18      To establish a *prima facie* case of racial discrimination under Title VII, Ms. Manning must offer

19  admissible evidence that (1) she belongs to a class of persons protected by Title VII; (2) she performed her

20  job satisfactorily; (3) she suffered an adverse employment action; and (4) the District treated her differently

21  than a similarly situated employee who does not belong to the same protected class. *See McDonnell*

22  *Douglas*, 411 U.S. at 802.

23      Ms. Manning's briefing does not clearly set out her theory regarding the second element, but the

24  court's review of the record indicates that she has not provided admissible evidence to show that at the

25  time she was terminated, she performed her job satisfactorily. *Accord Phipps v. Gary Drilling Co., Inc.*,

26  722 F. Supp. 615, 625 (E.D. Cal. 1989) (summary judgment upheld where plaintiff "failed to carry his

27  initial burden of establishing a prima facie case of age discrimination ... [where he] clearly failed to meet

28  defendant's job expectations due to his poor work performance"); *Cengr v. Fusibond Piping Systems, Inc.*,

135 F.3d 445, 452 (7th Cir. 1998) (plaintiff failed to establish prima facie case where record demonstrates that plaintiff failed to meet employer's legitimate expectations); *Ziegler v. Beverly Enterprises-Minnesota, Inc.*, 133 F.3d 671, 675-76 (8th Cir. 1998) ("District Court correctly determined that there was no genuine issue of material fact as to whether [plaintiff] failed to perform her job" as demonstrated by evaluations replete with criticisms covering an extended period of time.).

Ms. Manning does point to evidence—her performance evaluations—that show she performed satisfactorily from 1999-2003, but those evaluations do not establish that she performed satisfactorily in 2004 and 2005. To the contrary, her evaluations indicate that her performance was not satisfactory in the two years leading up to her termination. Moreover, Ms. Manning did not challenge those evaluations, but rather indicated that her performance did in fact need improvement.

Ms. Manning also presented a deposition from Jim Cail, a non-supervisory District employee who was somewhat familiar with some aspects of her work.[1] That employee, a lead laborer who was also supervised by Ms. Ohlson, stated that in his admittedly limited experience, Ms. Manning did not botch up vehicle work requests, nor had he observed her being rude or unprofessional. Dkt. #42-4, p. 4-5.

These statements, taken at face value, are insufficient to establish that Ms. Manning performed her work satisfactorily in the months and years leading up to her termination. Even assuming the admissibility of Mr. Cail's non-expert testimony about his opinion of the quality of Ms. Manning's work, Mr. Cail was not exposed to and thus could not effectively evaluate the vast majority of Ms. Manning's overall work performance. In a 2003 memo requesting training, Ms. Manning describes a very long list of her job duties, including providing secretarial support to the supervisors; updating and maintaining safety materials; calculating time and materials for the Asbestos Removal/Repair Project; editing and/or typing correspondence, reports, and memoranda; performing data entry on the maintenance work order system; reviewing maintenance work requests; preparing purchase order requisitions for maintenance swing shift; preparing various types of invoices; maintaining personnel documentation; et al. Dkt. #42-5 p. 4-5. At

---

[1]In her opposition brief, Ms. Manning asserts that Rick Long, another long time employee with Building and Grounds, stated in deposition that he had "never observed Manning being rude or unprofessional and that he had never observed her work being substandard." Dkt. #51, p. 12. However, the brief does not provide any citation to the record, and the court is unable to locate any excerpts from Mr. Long's deposition among the hundreds of pages of exhibits filed in support of Ms. Manning's opposition. The record therefore does not support Ms. Manning's assertion that a second employee found aspects of her work to be acceptable.

1   most, Mr. Cail's deposition establishes only that Ms. Manning met Mr. Cail's own subjective standards

2   when she processed vehicle work requests, not that Ms. Manning met the District's legitimate job

3   expectations.

4          Lending further support to this conclusion, at least one other circuit has noted that co-worker

5   opinions are "close to irrelevant" in Title VII claims. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280

6   (4th Cir. 2000) ("[I]t is the perception of the decision maker which is relevant.... The alleged opinions of ...

7   co-workers as to the quality of [plaintiff's] work are ... 'close to irrelevant.'") (internal quotations and

8   citations omitted). It is true that *Hawkins* has not been adopted in this circuit. However, given this circuit's

9   statement that a plaintiff's own "subjective personal judgments of her competence alone do not raise a

10  genuine issue of material fact," *Bradley*, 104 F.3d at 270, it is difficult to see how Mr. Cail's subjective

11  personal judgments about Ms. Manning's competence at one specific aspect of her job, without something

12  more, could raise an issue of material fact.

13         Notwithstanding the foregoing, the Court believes that Ms. Manning has created a genuine issue of

14  material fact by alleging at oral argument, in response to a direct question from the Court, that the negative

15  performance evaluations of 2004 and 2005 were racially motivated and inaccurate.  The evidence

16  supportive of such an allegation is scant and did not readily come to plaintiff's mind during her deposition

17  when she expressed agreement with the negative comments contained within the evaluations.

18  Nevertheless, the Court will recognize her newly-voiced allegations and, based upon the evidence stated

19  above, determines that there is a genuine issue of material fact as to whether plaintiff was satisfactorily

20  performing her job at the time of her termination.

21         The District has clearly articulated legitimate, nondiscriminatory reasons for plaintiff's termination.

22  However, the Court has concluded that whether these reasons are in fact a pretext for discrimination is an

23  issue best left for the jury.

24         Accordingly, as to Ms. Manning's Title VII racial discrimination claims, the District's Motion for

25  Summary Judgment is **DENIED**.

26

27                                  *D. ADA discrimination claims*

28         The ADA prohibits employers from discriminating against "a qualified individual with a disability

because of the disability." 42 U.S.C.A. § 12112(a). To prevail on her disability discrimination claim, Ms. Manning must establish: (1) that she is a disabled person within the meaning of the ADA; (2) that she is qualified, with or without reasonable accommodation, that is, able to perform the essential functions of the job; and (3) that the employer terminated her because of her disability. *Bradley*, 104 F.3d at 271. A plaintiff bears the burden of demonstrating that she can perform the essential functions of her job with or without reasonable accommodation. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).

Despite the sparse evidence regarding Ms. Manning's possible disability, the issue of whether she has a disability protected by the ADA is a triable issue of fact. A "disability" is defined as follows:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment

42 U.S.C. § 12102(2). This definition is construed narrowly. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184,197 (2002). Ms. Manning did not present any evidence that she was substantially limited in one or more major life activities, has not produced a record of the impairment, nor presented evidence that her employer treated her as though she had a disability. Nevertheless, some of the District's criticisms in Ms. Manning's evaluations correlate with Ms. Manning's claimed impairments such that a reasonable jury is not precluded from finding that Ms. Manning was substantially limited in a major life activity.

As discussed at greater length above, Ms. Manning's 2004 and 2005 performance evaluations indicate that she was unable to properly perform the essential functions of her job at the time she was terminated. Ms. Manning has made no showing, nor has she even argued that she would have been able to more properly perform those functions had the District made some unspecified reasonable accommodations. Although there apparently exists a report from Ms. Manning's psychologist concerning specific accommodations, that report is not in the record.   Nevertheless, because Ms. Manning now disputes the evaluations, the court recognizes that her ability to perform essential functions of her job is a genuine issue of material fact.

Ms. Manning has presented no evidence to suggest that she was terminated because of her

disability. Ms. Manning only raised the specter of disability after she was notified that the Superintendent would recommend her for termination. Whatever reason(s) the District may have had for recommending termination, there is no evidence that the reasons included a disclosed, recognized disability. Notwithstanding the foregoing, the District may have had notice that Ms. Manning had a disability when she filed her 2004 lawsuit that included an ADA claim.  Conduct resulting from a disability is considered part of the disability itself, *Humphrey v. Memorial Hospitals Ass'n,* 239 F3d 1128, 1139-40 (9th Cir. 2001), and a jury need only find that the District's decision was partially motivated by the disability. *Gambini v. Total Renal Care. Inc.*, 486 F.3d 1087, 1094 (9th Cir. 2007).  As a result, and in light of the District's potential notice of the disability, the Court cannot rule out the possibility that a reasonable jury could find that the district terminated Ms. Manning's employment, at least in part, because of her conduct resulting from the disability.

Because Ms. Manning has presented sufficient evidence to raise a genuine issue of fact regarding her ADA claim, the District's motion for summary judgment must be DENIED.

*E. ADA retaliation claims*

The prohibition against retaliation exists in the ADA to protect employees who complain about an employer's disparate treatment on the basis of disability. To make out a prima facie case of retaliation, an employee must show (1) that she engaged in a protected activity; (2) that her employer subjected her to an adverse employment action; and (3) that there is a causal link between the protected activity and the adverse action. *Henderson*, 217 F.3d at 1240. If a plaintiff has asserted a *prima facie* retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. *Id.* If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. *Id.*

Ms. Manning does not make clear what activity protected under the ADA that she engaged in, but the Court's review of the record shows that she likely engaged in two protected activities under the ADA: filing her 2004 lawsuit and requesting accommodation for her alleged disabilities after she was notified that she would be terminated.

Other activities, such as filing the 2003 and 2004 EEOC complaints and possibly informing her

supervisor that she may have been dyslexic, were not protected under the ADA. Neither her 2003 EEOC complaint, Dkt. #37-2, p. 50-52, nor her 2004 EEOC complaint, Dkt. #37-3, p. 4-6, allege that the District had discriminated against her on the basis of disability. Therefore, an ADA retaliation claim cannot be based on those EEOC complaints.

Similarly, a review of the case law indicates that *requesting accommodation* is a protected activity, but merely informing an employer about an alleged disability is not. *See, e.g., Mondaine v. American Drug Stores, Inc.*, 408 F.Supp.2d 1169 (D.Kan. 2006) (Employee engaged in "protected activity" under the ADA on three occasions by requesting accommodation for her glaucoma.); *Grazioli v. Genuine Parts Co.*, 409 F.Supp.2d 569 (D.N.J. 2005) (Allegations that employee merely informed employer that she was recently diagnosed with chronic obstructive pulmonary disease did not establish that employee engaged in a protected activity under the ADA.); *Merit v. Southeastern Pennsylvania Transit Authority*, 315 F.Supp.2d 689 (E.D.Pa. 2004) (Employee engaged in protected activity by requesting accommodation to be transferred because of physical limitations.); *Crock v. Sears, Roebuck & Co.*, 261 F.Supp.2d 1101 (S.D.Iowa 2003) (Employee's alleged complaints that she was disabled and needed accommodation constituted a protected activity.). These cases are in line with Ninth Circuit precedent establishing that actively *pursuing one's rights* under the ADA, as by requesting accommodation, constitutes a protected activity. *Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 849 -850 (9th Cir. 2004). *See also, e.g., McAlindin v. County of San Diego*, 192 F.3d 1226, 1238 (9th Cir.1999) (stating that "vigorously asserting [one's] rights" under the ADA constitutes protected activity).

Thus, even if as Ms. Manning alleges, she had merely informed the District that she was dyslexic at some point prior to the District's decision to terminate her, such disclosure is not a vigorous assertion of her rights under the ADA and is therefore not a protected activity.

The record does show, however, that Ms. Manning engaged in a protected activity under the ADA when she requested accommodation for her alleged disabilities in April 2005. However, the record also unequivocally indicates that Ms. Manning requested accommodation only *after* the District had decided to terminate her. She cannot retroactively impute a retaliatory motive to the District by engaging in a protected activity after she was informed that she would be terminated. Therefore, although Ms. Manning can show that requesting accommodation in April 2005 was a protected activity, she cannot show that

1  there was a causal link between that activity and her termination.

2  Turning to her other protected activity, Ms. Manning's 2004 lawsuit, Case No. C04-5491-FDB,

3  stated a discrimination claim arising under the ADA. Filing that lawsuit must be regarded as a vigorous

4  assertion of her rights under the ADA even though (1) at that time, she had no right to sue under the ADA

5  because she had not alleged ADA discrimination in her 2004 EEOC complaint and (2) the complaint made

6  only general, unsupported assertions that she had been discriminated against in some unknown way on

7  unknown occasions because of some unknown disability. Still, filing the 2004 lawsuit was a protected

8  activity, and about three months later, Ms. Manning was suspended for ten days without pay. This

9  proximity in time between the protected activity and an adverse employment action is sufficient to imply a

10  causal link between the two.

11  Thus, Ms. Manning has stated a *prima facie* case of retaliation under the ADA. Although the

12  District did present a legitimate non-discriminatory motivation for that adverse employment action, Ms.

13  Manning presented sufficient evidence to allow a reasonable jury to find that the District's stated

14  motivations were pretextual. *See* discussion *infra* Part III.G. Therefore, the District's motion for summary

15  judgment as to Ms. Manning's ADA retaliation claims must be DENIED.

16

17  *F. Title VII retaliation claims*

18  An employer may not retaliate against an employee for asserting her rights under Title VII. *See* 42

19  U.S.C. § 2000e-3(a). Ms. Manning asserted her rights when she filed EEOC complaints against the District

20  in July 2003 and February 2004. She generally alleges that the District retaliated against her for filing these

21  complaints.

22  The parties agree that filing the 2003 and 2004 EEOC complaints were protected activities. And

23  although Ms. Manning does not specifically indicate which employment actions she alleges were adverse,

24  the parties do not dispute that the District took *some* adverse employment action against Ms. Manning.

25  The EEOC has broadly interpreted "adverse employment action" to mean "any adverse treatment

26  that is... reasonably likely to deter the charging party or others from engaging in protected activity." EEOC

27  Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998). Although EEOC Guidelines are not binding

28  on the courts, they "constitute a body of experience and informed judgment to which courts and litigants

1    may properly resort for guidance." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986) (quoting

2    *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). S*ee also Gutierrez v. Municipal Court*, 838 F.2d

3    1031, 1049 (9th Cir. 1988). The EEOC test is consistent with Ninth Circuit holdings. *Ray v. Henderson*,

4    217 F.3d 1234, 1242 -1243 (9th Cir. 2000).

5           Applying the EEOC test, the Court's review of the record indicates that the following actions may

6    qualify as "adverse." On April 26, 2004, Ms. Manning received a letter of reprimand arising from verbal

7    altercations that took place on February 4, 2004. On May 6, 2004, she was suspended for five days because

8    in late February, she stated that she would not work with a student intern who had made a complaint about

9    Ms. Manning several years earlier. On November 18, she was suspended for ten days because she had taken

10   leave without authorization in April. In February 2005, she was placed on probation, and in April 2005, she

11   received a wholly unsatisfactory performance evaluation and was recommended for termination. In July

12   2005, she was finally terminated.

13          To establish causation, a plaintiff must show that the protected activity actually played a role in the

14   employer's decision making process and had a determinative influence on the outcome. *Head v. Glacier*

15   *Northwest Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005) (ADA); 42 U.S.C. § 2000e-2(m) (Title VII). Ms.

16   Manning has no direct evidence to suggest that her 2003 and 2004 EEOC complaints had a determinative

17   influence on the District's actions. However, in some cases, causation may be inferred from "proximity in

18   time between the protected action and the allegedly retaliatory employment decision." *Henderson,*  217

19   F.3d at 1244.

20          The *Henderson* court inferred causation in the following circumstances. *Id.* The employer received

21   a copy of the plaintiff's EEO complaint and immediately instituted a "lockdown." *Id.* at 1239. About one

22   week later, the employer altered the plaintiff's work schedule. *Id.* The next month, the plaintiff filed two

23   more EEO complaints, and approximately two months later, the employer reduced the plaintiff's workload

24   and pay. *Id.* In other cases, courts have inferred a causal link when an adverse employment action was

25   taken within several months of a protected activity. *See, e.g., Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th

26   Cir. 1987) (sufficient evidence existed where adverse actions occurred less than three months after

27   complaint filed, two weeks after charge first investigated, and less than two months after investigation

28   ended); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 730 (9th Cir. 1986) (prima facie case of causation

was established when discharges occurred forty-two and fifty-nine days after EEOC hearings).

On the other hand, "timing alone will not show causation in all cases; rather, in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (internal citations and quotations omitted). *See also, e.g., Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009-10 (7th Cir. 2000) (finding that a one-year interval between the protected expression and the employee's termination, standing alone, is too long to raise an inference of discrimination); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398-99 (7th Cir.1999) (four months too long); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir.1998) (eight months too long), cert. denied, 528 U.S. 988 (1999); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998) (five months too long); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (four months too long).

In Ms. Manning's case, the approximately two month interval between her February 2004 EEOC complaint and the District's April 2004 letter of reprimand is probably sufficient to raise a causal inference. Thus, Ms. Manning has established a *prima facie* case of retaliation and shifted the burden to the District to show that it had non-discriminatory reasons for its actions. The District has met its burden, having introduced evidence to show that its actions were motivated by Ms. Manning's performance and behavioral problems. Thus, the presumption of unlawful discrimination "simply drops out of the picture," and the burden shifts back to Ms. Manning to show that the District's non-discriminatory motivations were mere pretexts. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

## *G. Pretext*

"[W]hen *all legitimate reasons* for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race". *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978) (emphasis added).

The District has articulated legitimate reasons for its actions, so if Ms. Manning can establish a *prima facie* case for her discrimination or retaliation claims, then she must also show that all of the District's stated legitimate reasons are merely pretexts and that the District really had impermissible racial,

1  sexual, or retaliatory motives for its actions. "The ultimate burden of persuading the trier of fact that the

2  defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*,

3  450 U.S. at 253 (1981).

> A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence. Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption. Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer.
>
> Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate discrimination. It can take two forms. First, the plaintiff can make an affirmative case that the employer is biased. For example, statistical evidence is circumstantial evidence that could, if sufficiently probative, point to bias. Second, the plaintiff can make his case negatively, by showing that the employer's proffered explanation for the adverse action is "unworthy of credence." .... The distinction between direct and circumstantial evidence is crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment. Because direct evidence is so probative, the plaintiff need offer "very little" direct evidence to raise a genuine issue of material fact. But when the plaintiff relies on circumstantial evidence, that evidence must be "specific and substantial" to defeat the employer's motion for summary judgment

13  *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1094-95 (9th Cir. 2005) (internal quotations and

14  citations omitted). Ms. Manning does not offer any direct evidence of the District's retaliatory intent. Ms.

15  Manning also does not offer any statistical evidence.[2] She must therefore rely entirely on circumstantial

16  evidence to show that the District's explanations for its actions are unworthy of credence. To show as

17  much, she would have to present "specific and substantial" circumstantial evidence of intentional retaliation

18  to defeat the District's motion for summary judgment. *See id.* at 1096. Similarly, if it were determined that

19  she had made a *prima facie* case on her discrimination claims, she would have to present "specific and

20  substantial" circumstantial evidence of intentional discrimination to defeat the District's motion for

21  summary judgment.

22      The District argues that Ms. Manning's burden of showing pretext is further enhanced by the

23  "same-actor" inference. In *Bradley v. Harcourt, Brace & Co.*, the Ninth Circuit held that "where the same

---

[2] The record does contain a list of employees who were disciplined, but the record does not appear to contain any evidence from which a probative statistical inference could be drawn. Moreover, it is not clear that the Buildings and Grounds department was large enough to be susceptible to a probative statistical analysis. *See Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072 (9th Cir. 1986) (Labor pool of 28 employees in department was too small to be statistically relevant and to create inference that employer had discriminatory intent when it laid off four black employees and one nonblack employee from department.); *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654 (9th Cir. 2002) (Statistical evidence did not present stark pattern, since it was derived from small sample, and did not take into account work performance of laid off employees.).

actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur *within a short period of time*, a strong inference arises that there was no discriminatory action." 104 F.3d at 270-71 (emphasis added). The District argues that this holding is relevant here because many of the allegedly retaliatory acts were perpetrated by Margaret Ohlson, the same woman who hired Ms. Manning in 1998. Ms. Manning does not argue to the contrary.

Some courts have applied the same-actor inference when an adverse employment action was taken up to three years after the plaintiff was hired. *See, e.g., Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1286 (9th Cir. 2000) (taking the same-actor inference into account when the positive action occurred more than a year earlier than the negative action); *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (affirming summary judgment in an employment discrimination case in part because the plaintiff "was fired by the same man who had hired him three years earlier"). Other courts have applied the inference when the same actor who took adverse action against the plaintiff had also recently taken any favorable employment action, such as giving a promotion to the plaintiff. *See Coghlan*, 413 F.3d at 1097.

Given this relatively broad interpretation of "short period of time," Ms. Manning probably would have to overcome the "same-actor" inference if she needed to show that her failure to be reclassified in 2000 was an adverse employment action giving rise to her racial discrimination claims. However, as to her retaliation claims, it is not clear that Ms. Manning's being hired in 1998 and her first EEOC complaint in 2003[3] occurred within a short enough period of time for the "same-actor" inference to apply.

Ms. Manning argues that pretext may be inferred from the following evidence: (1) Margaret Ohlson did not give Ms. Manning enough notice to be able to lower Ms. Manning's performance evaluation in April 2003, despite Ms. Manning's poor performance; (2) three African-American women working under Margaret Ohlson left their employment with the District; (3) Ms. Manning is the only office assistant to have been terminated; (4) only Ms. Manning was disciplined when she got into verbal altercations with two Caucasian women in one day; (5) Ms. Manning was placed on unpaid administrative leave while the District looked into her disability claims from April through July 2005; (6) the District did not schedule another appointment with Dr. Clark after Ms. Manning did not attend her May 23, 2005 appointment.

---

[3] Prior to 2003, Ms. Manning does not appear to have engaged in any protected activities, so any actions the District may have taken before that date cannot have been taken for retaliatory reasons.

Although none of these pieces of evidence would allow a jury to draw particularly strong inferences that the District acted with an impermissible motive, Ms. Manning does not have a very high standard to meet. *See, e.g., Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1032-1034 (9th Cir. 2006) (While "[t]he truth might be that all of [defendant's] management aims were legitimate and matters of prerogative and personal style," summary judgment was not appropriate because a reasonable jury *could* infer a discriminatory intent if it determined that defendant's explanations were not credible.). Because a reasonable jury could find on the record that the District's stated motives were pretexts for discriminatory or retaliatory motives, the District is not entitled to summary judgment on those claims for which Ms. Manning has made a *prima facie* case. Accordingly, the District's motion for summary judgment as to Ms. Manning's ADA and Title VII retaliation claims must be DENIED.

## IV. CONCLUSION

The defendants' motion for summary judgment, Dkt. #36, is GRANTED with respect to all claims against defendants Mr. Watson and Mr. Price, is GRANTED with respect to Title VII and ADA claims against individual defendants James Shoemake, Sam Bell, Margaret Ohlson, Susan Larson, and any other individual defendants, is DENIED with respect to the Title VII racial discrimination claims against the District is GRANTED with respect to state claims, is GRANTED with respect to Title VII gender discrimination,  is GRANTED with respect to the Title VII racially motivated hostile work environment claims against the District, is DENIED with respect to the ADA discrimination claims against the District, and is DENIED with respect to the ADA and Title VII retaliation claims against the District.

**IT IS SO ORDERED.**

DATED this 30TH day of August, 2007.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER
Page - 25